## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| PAUL HARDINE, | ) | Civil Action No. |
|  | ) |  |
| *Plaintiff*, | ) | Filed Electronically |
|  | ) |  |
| vs. | ) |  |
|  | ) |  |
| CENTER FOR BEHAVIORAL HEALTH-PA, LLC and ACADIA HEALTHCARE COMPANY, INC., | ) ) ) |  |
|  | ) |  |
| *Defendants*. | ) |  |
|  | ) |  |

### COMPLAINT IN CIVIL ACTION

Plaintiff, Paul Hardine ("Mr. Hardine"), by and through the undersigned counsel, files the following Complaint in Civil Action against Defendants, Center for Behavioral Health-PA, LLC and Acadia Healthcare Company, Inc. (collectively "Defendants"). This action seeks to remedy Defendants' unlawful employment practices, including racial discrimination, the creation of a hostile work environment, and retaliation against Mr. Hardine in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII"), and the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq*. (the "PHRA").

### THE PARTIES

1.      Plaintiff, Paul Hardine ("Plaintiff"), is an adult individual who resides in Pittsburgh, Pennsylvania.

2.      Defendant, Center for Behavioral Health-PA, LLC ("CBH-PA"), is a corporation or similar entity with a principal place of business located at 6100 Tower Circle, Suite 1000, Franklin, TN 37067 and a registered office with Corporation Service Company, Dauphin County,

Pennsylvania. Plaintiff reported to work on a regular basis at Defendant CBH-PA's facility located at 1391 Washington Boulevard, Pittsburgh, Pennsylvania 15206 (the "Facility").

3.       Defendant, Acadia Healthcare Company ("Acadia"), is a corporation or similar entity with a principal place of business located at 6100 Tower Circle, Suite 1000, Franklin, TN 37067 and a registered office with Corporation Service Company, Dauphin County, Pennsylvania.

## JURISDICTION AND VENUE

**A.     This Court Possesses Subject Matter Jurisdiction Pursuant to 28 U.S.C. § 1331 and Supplemental Jurisdiction Pursuant to 28 U.S.C. § 1367.**

3.       This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 ("Federal Question Jurisdiction") as Plaintiff is advancing claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII") (Plaintiff's claims arising under Title VII are identified as the "Federal Law Claims").

4.       Plaintiff is also advancing claims under the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq*. (the "PHRA") (Plaintiff's claims arising under the PHRA are identified as the "State Law Claims").

5.       This Court may exercise supplemental jurisdiction over the State Law Claims pursuant to 28 U.S.C. § 1367(a) as the Federal Law Claims and the State Law Claims share operative facts that support the corresponding causes of action within the Federal Law Claims and the State Law Claims.

6.       Further, the operative facts between the Federal Law Claims and the State Law Claims mirror one another to such a degree that they form the "same case or controversy" under Article III § 2 of the United States Constitution which further supports this Court's exercise of supplemental jurisdiction over the State Law Claims.

**B.      The United States District Court for the Western District of Pennsylvania is the Appropriate Venue for this Matter Pursuant to 28 U.S.C. § 1391(b).**

7.      Venue is proper in the United States District Court for the Western District of Pennsylvania (hereinafter, the "Western District") as a substantial part of the events and omissions giving rise to the Federal Law Claims and State Law Claims occurred within this judicial district. Therefore, venue is proper pursuant to 28 U.S.C. § 1391(b).

8.      Specifically, these events and omissions occurred within Allegheny County, Pennsylvania, which is one of the counties encompassed by the Western District.

9.      This matter is properly before the Pittsburgh Division of the Western District given the conduct complained of herein arose in Allegheny County, Pennsylvania, and conduct arising within Allegheny County is docketed within the Pittsburgh Division of the Western District Pursuant to LCvR 3.

**C.      This Court May Exercise Personal Jurisdiction Over Defendants.**

10.      This Court may exercise personal jurisdiction over Defendants pursuant to 42 Pa. C.S. § 5301(a)(2), and this Court's exercise of jurisdiction comports with the Due Process Clause of the United States Constitution.

11.      42 Pa. C.S. § 5301 states: "The existence of any of the following relationships between a person and this Commonwealth shall constitute a sufficient basis of jurisdiction to enable the tribunals of this Commonwealth to exercise general personal jurisdiction over such person." 42 Pa. C.S. § 5301(a). This definition is expanded to "corporations" pursuant to 42 Pa. C.S. § 5301(a)(2) which provides:

> Corporations.—
> (i) Incorporation under or qualification as a foreign corporation under the laws of this Commonwealth.
> (ii) Consent, to the extent authorized by the consent.

       (iii) The carrying on of a continuous and systematic part of its general business within this Commonwealth.

42 Pa. C.S. § 5301(a)(2).

12.     Defendants carry on a continuous and systematic part of its general business within this Commonwealth by, *inter alia*, operating its healthcare facility at 1391 Washington Boulevard, Pittsburgh, Pennsylvania 15206.

13.     Defendants maintain their Facility in Pennsylvania and conduct their business operations extensively within the Commonwealth, thereby purposefully availing itself of the privilege of conducting activities within this forum. Accordingly, Defendants may properly be personally brought before this Court pursuant to 42 Pa. C.S. § 5301(a)(2).

**D.    Plaintiff Has Exhausted His Administrative Remedies; His Federal and State Law Claims are Properly Before This Court.**

14.     Plaintiff has satisfied all procedural and administrative prerequisites under 42 U.S.C. § 2000e-5 and 43 P.S. § 959 and may now proceed to bring this action before the Court. Specifically:

a.   On or about May 16, 2024, Plaintiff dually filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC") seeking redress for the Federal Law Claims at charge number 533-2024-00159 (the "EEOC Charge") and a Complaint with the City of Pittsburgh Commission on Human Relations (the "PGHCHR"), as an agent for the Pennsylvania Human Relations Commission (the "PHRC"), seeking redress for the State Law Claims at complaint number EO-2024-052 (the "PGHCHR Complaint").

b.   On July 23, 2025, the EEOC issued a Dismissal and Notice of Rights (the "RTS Notice"), affording Plaintiff 90 days within which to timely file the Federal Law Claims and the State Law Claims. See **Exhibit A**, a true and correct copy of the RTS Notice.

c.  The instant complaint is filed within the 90-day time period.

## FACTUAL BACKGROUND

15.    Plaintiff is a 57-year-old African American male.

16.    In or around September 2021, Plaintiff began his employment with Defendants as a Security Guard at the Facility.

17.    In his role, Plaintiff was responsible for ensuring the safety of patients and employees and enforcing safety protocols.

18.    Plaintiff was compensated at an hourly rate of $16.48 and consistently worked no fewer than 33 hours per week.

19.    From the outset of his employment, Plaintiff's supervisors, Clinic Supervisor Jennifer Zapata ("Zapata") and Clinic Director Shanna Tresatti ("Tresatti"), subjected Plaintiff to pervasive racial discrimination and treated him differently than his non-African American counterparts.

### Pervasive Discrimination and Hostile Work Environment

20.    In December 2021, during a serious security emergency involving a violent patient altercation outside the clinic, Plaintiff requested urgent assistance from Zapata.

21.    Zapata, whose role included maintaining safety, refused to aid Plaintiff, stating she was "too busy," thereby subjecting Plaintiff to a dangerous situation and demonstrating a callous indifference to his safety.

22.    The day after the incident, Plaintiff reported Zapata's dereliction of duty to Tresatti.

23.    Tresatti completely ignored Plaintiff's report and instead levied a series of baseless and fabricated accusations against him, including that he was selling drugs, soliciting prostitution, and engaging in sexual misconduct with patients.

24.     Plaintiff vehemently denied these false allegations and demanded proof, which Tresatti failed to provide.

25.     Over the next two years, Plaintiff was repeatedly subjected to similar false allegations, including claims that he asked a patient for money for child support (despite his children being adults) and accepted candy from patients (despite his well-known diabetes diagnosis).

26.     On or about October 5, 2023, while performing his duties, Plaintiff approached a patient who had entered the clinic before the authorized time and instructed him to wait outside.

27.     The patient responded with aggression, invaded Plaintiff's personal space in a confrontational manner, and called Plaintiff a "nigger."

28.     The racial slur was shouted loud enough for multiple employees of Defendants to hear.

29.     Despite the clear and hostile nature of the incident, none of Defendants' staff or supervisors present intervened or offered any assistance to Plaintiff.

### Plaintiff's Complaints and Defendants' Retaliation

30.     On or about October 9, 2023, Plaintiff formally reported the October 5th incident to Zapata, along with the ongoing racial hostility and repeated false accusations he had been experiencing.

31.     In response to Plaintiff's report of being called a racial slur, Zapata was dismissive, stating, "it's just a word," and took no corrective action whatsoever.

32.     Shortly after Plaintiff's report, Defendants, through Zapata, issued Plaintiff a disciplinary "write-up" for "abandoning his post during a shift."

33.     The accusation in the write-up was pretextual. In reality, Plaintiff had taken a brief, medically necessary break to administer insulin.

34.     Defendants were aware of Plaintiff's diabetes diagnosis and his need to take such breaks to manage his medical condition.

35.     The write-up falsely claimed that Plaintiff had been away from his post for more than 45 minutes.

36.     Plaintiff possessed direct evidence to refute this false claim and, when he pointed out the inaccuracy to Zapata, she responded, "oh don't worry, I can rewrite it," revealing the arbitrary and retaliatory nature of the disciplinary action.

### Continued Intimidation and Constructive Termination

37.     Following the retaliatory write-up, Plaintiff met with Zapata and Regional Director Josh Nirella ("Nirella") and again reiterated his concerns regarding the ongoing false accusations and disparate treatment.

38.     Nirella categorically refused to address Plaintiff's legitimate concerns and instead intimidated him, stating only, "if you value your job, stay at your post."

39.     The totality of these events—including the pervasive disparate treatment, the baseless accusations, the unaddressed racial slurs and hostility, and the retaliatory discipline—created a work environment so hostile and intolerable that no reasonable person in Plaintiff's position could be expected to continue their employment.

40.     As a direct result of Defendants' systemic and continuous racially discriminatory and retaliatory conduct, Plaintiff was constructively terminated from his position on November 1, 2023.

### COUNT I
### RACIAL DISCRIMINATION IN VIOLATION OF TITLE VII AND THE PHRA

**42 U.S.C. § 2000e, *et seq.*; 43 P.S. § 951, *et seq.***

41.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth at length herein.

42.     Title VII of the Civil Rights Act of 1964 ("Title VII") makes it an unlawful employment practice for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

43.     Similarly, the Pennsylvania Human Relations Act ("PHRA") makes it an unlawful discriminatory practice for an employer "to discharge from employment such individual... or to otherwise discriminate against such individual... with respect to compensation, hire, tenure, terms, conditions or privileges of employment... if the individual is the best able and most competent to perform the services required." 43 P.S. § 955(a).

44.     To establish a prima facie case of racial discrimination, a plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that give rise to an inference of unlawful discrimination, such as when a similarly situated person not of the protected class was treated more favorably.

**A.     Plaintiff is a Member of a Protected Class.**

45.     As averred hereinabove, Plaintiff is an African American male.

46.     As such, Plaintiff is a member of a protected class under Title VII and the PHRA.

**B.    Plaintiff Was Qualified to Perform the Essential Duties of His Job.**

47.    At all times relevant to this Complaint, Plaintiff was qualified to perform the essential duties of his position as a Security Guard.

48.    Plaintiff possessed and exercised the skill, experience, and ability required for his role, which included ensuring patient and employee safety and enforcing safety protocols.

49.    Plaintiff consistently performed his duties from the time he commenced employment with Defendants in September 2021 until his constructive termination on November 1, 2023.

**C.    Plaintiff Suffered Adverse Employment Actions.**

50.    An "adverse employment action" is an action taken by an employer which is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.

51.    Plaintiff was subjected to a continuous and pervasive pattern of adverse employment actions because of his race, which created an abusive working environment and ultimately resulted in his constructive termination.

52.    Defendants, through its supervisors and management, including Zapata, Tresatti, and Nirella, subjected Plaintiff to a heightened level of scrutiny and held him to more stringent standards than his non-African American colleagues.

53.    Defendants subjected Plaintiff to a litany of baseless and fabricated accusations of serious misconduct, including selling drugs, soliciting prostitution, and engaging in sexual misconduct with patients, without any evidence.

54.    Defendants, through Zapata, demonstrated a callous indifference to Plaintiff's safety by refusing to provide assistance during a dangerous and violent patient altercation.

55. Defendants, through its supervisors, failed to take any action when a patient directed a racial slur at Plaintiff, and Zapata subsequently dismissed the incident, stating, "it's just a word."

56. Defendants' disparate treatment of Plaintiff based on his race was severe and tangible enough to affect Plaintiff's terms, conditions, and privileges of employment.

57. As a direct result of Defendants' unchecked discriminatory conduct, Plaintiff suffered the ultimate adverse employment action when the intolerable working conditions forced his constructive termination on November 1, 2023.

**D.    Plaintiff is Entitled to Punitive Damages.**

58. A plaintiff may recover punitive damages when they can demonstrate a defendant "engaged in discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1).

59. The terms "malice" and "reckless indifference" pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination.

60. At all times relevant herein, Defendants, through its supervisors and management, acted with malice and/or reckless indifference to Plaintiff's federally protected rights.

61. Defendants' supervisors were not only aware of the racially hostile environment and disparate treatment but actively participated in and perpetuated it by ignoring Plaintiff's complaints, levying false accusations, and refusing to address a blatant racial slur.

62. Zapata's statements that a racial slur is "just a word" and that she could simply "rewrite" a falsified disciplinary document demonstrate a conscious disregard for Plaintiff's rights and the law.

63.     Nirella's threatening statement to Plaintiff to "stay at your post" in response to legitimate complaints of discrimination further illustrates Defendants' intentional and reckless pattern of conduct.

64.     As a direct and proximate result of Defendants' discriminatory conduct in violation of Title VII and the PHRA, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional distress, embarrassment and humiliation, and pain and suffering, and is entitled to compensatory damages for these injuries.

WHEREFORE, Plaintiff, Paul Hardine, seeks a judgment against Defendants, Center for Behavioral Health-PA, LLC and Acadia Healthcare Company, Inc., for willful noncompliance with Title VII and the PHRA and seeks: (i) compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life; (ii) punitive damages in an amount to be determined at trial and in an amount sufficient to deter Defendants from engaging in future conduct of a similar nature; (iii) equitable relief in the forms of back pay and front pay; (iv) the costs of instituting this action together with reasonable attorney's fees incurred by Plaintiff; and (v) pre-judgment and continuing interest as calculated by law and any other relief the Court deems appropriate.

## COUNT II
### HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII AND THE PHRA
### 42 U.S.C. § 2000e, *et seq.*; 43 P.S. § 951, *et seq.*

65.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth at length herein.

66.     To establish a hostile work environment claim under Title VII and the PHRA, a plaintiff must show that: (1) the employee suffered intentional discrimination because of his race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the Plaintiff; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of *respondeat superior* liability. See *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).

67.     The analysis of whether conduct is severe or pervasive is based on a totality of the circumstances, examining "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." See *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

**A.     Plaintiff Suffered Intentional Discrimination Because of His Race.**

68.     As averred hereinabove, from the outset of his employment, Defendants, through its supervisors and management, subjected Plaintiff to intentional discrimination because of his race.

69.     This intentional discrimination manifested as disparate treatment, a heightened level of scrutiny not applied to his non-African American colleagues, and a series of baseless and humiliating accusations.

70.     On or about October 5, 2023, Plaintiff was subjected to a blatant and severe act of racial hostility when a patient called him a "nigger."

71.     This slur was uttered loudly and in the presence of other employees, yet none of Plaintiff's supervisors or colleagues intervened.

72.     When Plaintiff reported this incident, his supervisor, Zapata, demonstrated Defendants' own racial animus and condonation of the hostile environment by dismissing the slur as "just a word" and refusing to take any corrective action.

73.     The intentional discrimination was further evidenced by the pattern of false and racially motivated accusations levied against Plaintiff by his supervisors, including allegations of criminal conduct, which were never substantiated and were inconsistent with accusations made against non-African American employees.

**B.  The Discrimination Plaintiff Endured was Severe and Pervasive.**

74.     At all times relevant hereto, the racial discrimination Plaintiff experienced was both severe and pervasive, altering the conditions of his employment and creating an abusive working environment.

75.     The use of the racial epithet "nigger" is, in and of itself, a severely discriminatory act. Zapata's subsequent dismissal of this slur compounded its severity and affirmed that racial hostility was permissible in Defendants' workplace.

76.     The discrimination was also pervasive. It began shortly after Plaintiff's employment and continued unabated for approximately two years, manifesting in numerous forms:

    a.  Defendants' callous indifference to Plaintiff's safety during a violent altercation in December 2021;
    b.  A continuous stream of false accusations of serious misconduct from his supervisors;
    c.  Management's failure to address the October 5, 2023, racial slur incident;
    d.  Retaliatory discipline issued shortly after Plaintiff complained about the racial hostility; and
    e.  A direct threat from a Regional Director, Nirella, intended to intimidate Plaintiff into silence.

77.    The frequency and severity of these incidents, taken together, created a work environment permeated with racial hostility that unreasonably interfered with Plaintiff's work performance and well-being.

**C. The Discrimination Detrimentally Affected Plaintiff.**

78.    As averred hereinabove, Defendants' creation and maintenance of a hostile work environment was the direct and proximate cause of significant harm to Plaintiff.

79.    Plaintiff was forced to endure constant fear for his job security, humiliation from baseless accusations, and emotional distress from the unaddressed racial animus.

80.    The conduct of Defendants' supervisors, particularly their refusal to address his legitimate safety and discrimination complaints and their subsequent retaliation, left Plaintiff feeling isolated and unprotected.

81.    The hostile and abusive conditions became so intolerable that no reasonable person could be expected to continue working under such circumstances, which ultimately forced Plaintiff's constructive termination on November 1, 2023.

**D. The Discrimination Plaintiff Suffered Would Detrimentally Affect a Reasonable Person in Like Circumstances.**

82.    A reasonable African American employee in Plaintiff's position would have found the work environment to be hostile and abusive.

83.    Being subjected to the "nigger" slur, a term widely recognized as virulently racist and dehumanizing, is profoundly humiliating and threatening.

84.    A reasonable person would be further distressed and intimidated when their supervisor dismisses such a slur as "just a word," signaling that the employer condones racial hostility.

85.    Furthermore, any reasonable person would find it abusive to be subjected to a continuous pattern of unfounded accusations of criminal behavior, to have their safety disregarded by management, and to be threatened and retaliated against for reporting discrimination.

86.    Defendants' conduct persisted despite Plaintiff's repeated attempts to seek help from management, making it clear that the hostility was not only tolerated but actively perpetuated by those in authority. Any reasonable individual in Plaintiff's position would find these actions hostile and abusive.

### E.    Respondeat Superior Liability Exists Due to Defendants' Overt Role in Facilitating the Discrimination.

87.    *Respondeat superior* liability exists because Defendants were negligent and reckless in failing to take remedial action upon notice of the harassment and because Plaintiff's supervisors used their agency relationship with Defendants to create and perpetuate the hostile environment.

### I.    Defendants were Negligent and Reckless in their Failure to Discipline or Take Remedial Action Upon Notice of the Harassment.

88.    Defendants, through their supervisors and management including Zapata, Tresatti, and Nirella, had actual knowledge of the racially hostile conduct because Plaintiff directly and repeatedly reported it to them.

89.    Despite this actual knowledge, Defendants failed to take any prompt or effective remedial action.

90.    Instead of investigating Plaintiff's complaints and disciplining the responsible parties, Defendants' management ignored the complaints, dismissed the severity of a racial slur,

and actively participated in the harassment by retaliating against Plaintiff. This constitutes negligence and reckless indifference to Plaintiff's protected rights.

## II.    The Supervisors were Aided by Defendants in Effectuating a Hostile Environment.

91.    At all times relevant herein, the hostile conduct was perpetuated by Plaintiff's supervisors—Zapata, Tresatti, and Nirella—who were acting within the scope of their employment.

92.    These supervisors were aided in their commission of the tortious conduct by the authority granted to them by Defendants. They used their positions to levy false accusations, issue retaliatory discipline, and intimidate Plaintiff.

93.    Defendants aided its supervisors by failing to correct their hostile behavior and instead permitting it to continue and escalate, culminating in Plaintiff's constructive termination.

94.    Accordingly, *respondeat superior* liability attaches to Defendants for thei failure to provide a work environment free of racial hostility and for the actions of its supervisors.

95.    As a direct and proximate result of Defendants' conduct in creating and maintaining a hostile work environment, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional distress, embarrassment, humiliation, and pain and suffering, and is entitled to compensatory damages for these injuries.

WHEREFORE, Plaintiff, Paul Hardine, seeks a judgment against Defendants, Center for Behavioral Health-PA, LLC and Acadia Healthcare Company, Inc., for willful noncompliance with Title VII and the PHRA and seeks: (i) compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including suffering, mental

anguish, inconvenience, and loss of enjoyment of life; (ii) punitive damages in an amount to be determined at trial and in an amount sufficient to deter Defendants from engaging in future conduct of a similar nature; (iii) equitable relief in the forms of back pay and front pay; (iv) the costs of instituting this action together with reasonable attorney's fees incurred by Plaintiff; and (v) pre-judgment and continuing interest as calculated by law and any other relief the Court deems appropriate.

**COUNT III**

**RETALIATION IN VIOLATION OF TITLE VII AND THE PHRA.S.C. 42 §**

**2000e-3(a); 43 P.S. § 955(d)**

96.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth at length herein.

97.     Title VII makes it an unlawful employment practice for an employer to discriminate against any of its employees "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

98.     Similarly, the PHRA makes it an unlawful discriminatory practice for any employer "to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act." 43 P.S. § 955(d).

99.     To establish a prima facie case of retaliation, a plaintiff must show that: (1) he engaged in a statutorily protected activity; (2) his employer took a materially adverse action against him; and (3) there was a causal connection between the protected activity and the adverse action.

A.      **Plaintiff Engaged in Legally Protected Activity.**

100.    Plaintiff engaged in statutorily protected activity when he opposed employment practices that he reasonably and in good faith believed constituted unlawful discrimination and harassment under Title VII and the PHRA.

101.    Specifically, on or about October 9, 2023, Plaintiff made a formal report to his supervisor, Zapata, complaining about the severe and hostile incident on October 5, 2023, where he was called a "nigger," and about the ongoing racial hostility and false accusations he had been subjected to throughout his employment.

102.    This opposition to racial discrimination and a racially hostile work environment constitutes protected activity under both Title VII and the PHRA.

C.   **Defendants Subjected Plaintiff to Materially Adverse Employment Actions.**

103.    A materially adverse action is one that might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

104.    Following Plaintiff's protected activity, Defendants, through its supervisors and management, subjected Plaintiff to a series of materially adverse employment actions.

105.    First, "shortly after" Plaintiff's October 9, 2023 complaint, Defendants retaliated by issuing him a disciplinary "write-up" for "abandoning his post during a shift." This write-up was entirely pretextual, as it was based on Plaintiff taking a brief, medically necessary break to administer insulin for his known diabetes condition.

106.    Second, in a subsequent meeting, Regional Director Nirella took further adverse action by refusing to address Plaintiff's complaints and instead threatening and intimidating him, stating, "if you value your job, stay at your post."

107.    Third, as a culmination of the discrimination, harassment, and retaliation, the work environment became so intolerable that it resulted in Plaintiff's constructive termination on November 1, 2023, the ultimate adverse employment action.

**F.  A Causal Link Exists Between Plaintiff's Protected Activity and Defendants' Adverse Actions.**

108.    A causal connection between Plaintiff's protected activity and Defendants' adverse actions is established by the unusually suggestive temporal proximity of the events and the evidence of pretext and ongoing antagonism.

109.    The retaliatory write-up was issued "shortly after" Plaintiff complained about racial discrimination on October 9, 2023. This close timing is strongly indicative of a retaliatory motive.

110.    The reason given for the disciplinary action was pretext for unlawful retaliation. Defendants' claim that Plaintiff was away from his post for 45 minutes was false, and the actual reason was a medically necessary break that Defendants were aware of. Zapata's statement that she could simply "rewrite" the false write-up is direct evidence of retaliatory animus and a conscious effort to create a fraudulent basis for discipline.

111.    The pattern of antagonism continued after the initial complaint and write-up, as evidenced by Nirella's threat to Plaintiff. This threat served to intimidate Plaintiff and punish him for speaking out against discrimination.

112.    As a direct and proximate result of Defendants' retaliatory conduct in violation of Title VII and the PHRA, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional distress,

embarrassment, humiliation, and pain and suffering, and is entitled to compensatory damages for these injuries.

WHEREFORE, Plaintiff, Paul Hardine, seeks a judgment against Defendants, Center for Behavioral Health-PA, LLC and Acadia Healthcare Company, Inc., for willful noncompliance with Title VII and the PHRA and seeks: (i) compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life; (ii) punitive damages in an amount to be determined at trial and in an amount sufficient to deter Defendants from engaging in future conduct of a similar nature; (iii) equitable relief in the forms of back pay and front pay; (iv) the costs of instituting this action together with reasonable attorney's fees incurred by Plaintiff; and (v) pre-judgment and continuing interest as calculated by law and any other relief the Court deems appropriate.

## JURY DEMAND

113.    Plaintiff, Paul Hardine, hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

**THE WORKERS' RIGHTS LAW GROUP, LLP**

Date:  October 20, 2025

By: /s/    *Brendan K. Petrick*
        Brendan K. Petrick, Esq. (Pa. I.D. No. 88968)
        Patrick W. Carothers, Esq. (Pa. I.D. No. 85721)
        Elizabeth Murphy, Esq. (Pa. I.D. No. 334769)

        The Workers' Rights Law Group, LLP
        Foster Plaza 10
        680 Andersen Drive, Suite 230
        Pittsburgh, PA 15220
        Telephone: 412.910.9592
        brendan@workersrightslawgroup.com
        patrick@workersrightslawgroup.com
        elizabeth@workersrightslawgroup.com

        *Counsel for Plaintiff, Paul Hardine*